## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JUWAIRIA ABBAS,

*Plaintiff*,

v.

UNITED STATES CITIZENSHIP
& IMMIGRATION SERVICES;

VERMONT SERVICE CENTER;

KENNETH CUCCINELLI,
**Acting Director, U.S. Citizenship &
Immigration Services, in his official
capacity;**

UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY;

and

CHAD WOLF,
**Acting Secretary, U.S. Department
of Homeland Security, in his
official capacity,**

*Defendants*.

Case No. 20-CV-____

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND
PETITION FOR WRIT OF MANDAMUS**

## INTRODUCTION

1. This is an action to compel Defendants United States Citizenship & Immigration Services, the Vermont Service Center, Kenneth Cuccinelli, United States Department of Homeland Security, and Chad Wolf, and those acting under them, immediately and forthwith to take action on an I-360 Petition and an I-485 Application to Register Permanent Residence or Adjust Status (collectively, the "applications") filed by Plaintiff Juwairia Abbas. A favorable adjudication of her pending applications would result in Ms. Abbas becoming a lawful permanent resident.

2. The applications were filed and remain within the jurisdiction of Defendants, who have improperly withheld action on said applications to Plaintiff's detriment.

## JURISDICTION

3. Jurisdiction in this Court is proper pursuant to, *inter alia*, 28 U.S.C. §§ 1331, 1361, and 1651, and pursuant to 5 U.S.C. §§ 555(b) and 706(1).

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question statute), since this is a civil action arising under the laws of the United States, including provisions of the Immigration and Nationality Act (INA), 8 U.S.C. § 1255, and all applicable regulations, policies, and procedures arising thereunder.

5. Jurisdiction is conferred by the Administrative Procedure Act (APA), 5 U.S.C. § 706(1), which provides that a "reviewing court shall compel agency action unlawfully withheld or unreasonably delayed."

6. This action is also brought pursuant to the All Writs Act, 28 U.S.C. § 1651, and the Mandamus Act, 28 U.S.C. § 1361, to compel Defendants to render a decision on a nondiscretionary duty owed to the Plaintiff.

7. This action challenges only the pace and unreasonable delay in processing the Plaintiff's applications, not any actual decision or denial of relief by the agency or the granting or denial of a petition.   Therefore, the jurisdiction-stripping provisions of 8 U.S.C. § 1252 do not apply.

## VENUE

8. Ms. Abbas resides within Manhattan.  Her address is located within the jurisdiction of the Southern District of New York.

9. Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States in their official capacities, brought in the district where Plaintiff resides, and no real property is involved.

## PARTIES

10. Plaintiff JUWAIRIA ABBAS is a citizen of Pakistan.  In 2014, she married an American citizen and concurrently filed an I-130 Petition and I-485 Application.  Her marriage broke down due to emotional and verbal abuse before either the I-130 Petition or I-485 Application was adjudicated.  In January 2018, she filed an I-360 Petition.  To date, none of her applications have been adjudicated.

11. Defendant UNITED STATES CITIZENSHIP & IMMIGRATION SERVICES (USCIS) is an agency of the U.S. government involved in the acts and omissions challenged, and it employs officers responsible for the acts and omissions alleged in this Complaint.

12. The VERMONT SERVICE CENTER is a component of Defendant USCIS that has jurisdiction over the I-360 Petition filed by Ms. Abbas.

13. Defendant KENNETH CUCCINELLI is the Acting Director of USCIS, and he employs officers responsible for the acts and omissions alleged in this Complaint.  This suit is

3

brought against Acting Director Cuccinelli in his official capacity, as he employs and directs the actions of USCIS employees within the relevant district and nationally.

14. Defendant DEPARTMENT OF HOMELAND SECURITY is an agency of the U.S. government involved in the acts and omissions challenged, and it employs officers responsible for the acts and omissions alleged in this Complaint.  Defendant USCIS is a component of Defendant Department of Homeland Security.

15. Defendant CHAD WOLF is the Acting Secretary of the Department of Homeland Security and is charged with the administration of the immigration and naturalization laws.  8 U.S.C. § 1103(a); *see also* Section 402 of the Homeland Security Act of 2002, 107 Pub. L. No. 296, 116 Stat. 2135 (Nov. 25, 2002).  This suit is brought against Acting Secretary Wolf in his official capacity, as he is charged with the authority to adjust the status of non-immigrants to immigrants.

## EXHAUSTION OF REMEDIES

16.  Ms. Abbas has taken numerous steps to prompt USCIS to perform its duty to adjudicate her I-360 Petition and I-485 Application, including filing case inquiries and seeking congressional assistance.  It defies common sense and fairness to punish Ms. Abbas for Defendants' administrative inaction, and she is left with no recourse other than petitioning this Court for relief.

## LEGAL BACKGROUND

### The Adjustment of Status Procedure for Spouses of U.S. Citizens

17. Immigration law provides pathways for certain non-citizens of the United States to adjust their immigration status to that of a lawful permanent resident (LPR).

18. Most commonly, an individual becomes eligible to adjust to LPR status if she or he is the

beneficiary of an approved immigrant visa petition through a family member or employer.  *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 245.1.

19. Under the INA, a U.S. citizen may petition for an immigrant visa for his or her spouse. 8 U.S.C. § 1154(a)(1)(A)(i).  Such a visa petition is filed through an I-130 Petition.

20. Separately, pursuant to 8 U.S.C. § 1255(a), an individual may receive an adjustment of immigrant status to that of an LPR if: (1) the individual makes an application for such adjustment, (2) the applicant is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to the applicant at the time the application is filed.  Such an adjustment application is filed through an I-485 Application.

21. An applicant residing in the United States may concurrently be the beneficiary of a visa petition and file an application for adjustment of status if, at the time of filing, approval of a visa petition "would make a visa immediately available to the alien beneficiary."  8 C.F.R. § 245.2(a)(2)(i)(B).

22. Immigrant visas for spouses of U.S. citizens are immediately available as visas for "immediate relatives" and are not subject to numerical limitations.  8 U.S.C. § 1151(b)(2)(A)(i).

23. If the beneficiary of an immigrant visa petition "is in the United States and is eligible for adjustment of status under section 245 of the Act [codified at 8 U.S.C. § 1255], the approved petition will be retained" by USCIS.  8 C.F.R. § 204.2(a)(3).

24. USCIS is required to notify the petitioner if a visa petition has been denied, the reasons for denial, and of the right to appeal.  8 C.F.R. § 204.2(a)(3).

25. USCIS has a duty to notify applicants for adjustment of status of the decision on their

application.  8 C.F.R. § 245.2(a)(5) ("The applicant shall be notified of the decision of the director, and, if the application is denied, the reasons for the denial.").

26. Congress has directed USCIS to process immigration benefit applications, including for adjustment of status, within 180 days. 8 U.S.C. § 1571(b).

**The Adjustment of Status Procedure for Abused Spouses of U.S. Citizens**

27. Immigration law also provides a pathway for the abused spouses of U.S. citizens to adjust to LPR status.

28. Under the INA and the Violence Against Women Act (VAWA), an applicant may petition for an immigrant visa if she is the spouse of a U.S. citizen and "has been battered or has been the subject of extreme cruelty perpetrated by [her] spouse."  8 U.S.C. § 1154(a)(1)(A)(iii)(I)(bb).

29. An applicant who qualifies for relief under this section is referred to as a "VAWA self-petitioner."  8 U.S.C. § 1101(a)(51).

30. Such an applicant files her own application, rather than having the U.S. citizen spouse file an application on her behalf.  *See* 8 U.S.C. § 1154(a)(1)(A)(i)-(iii).  The VAWA self-petitioner files an I-360 Petition.

31. "A successful [VAWA] self-petition . . . ultimately yields the same benefit to the self-petitioner that an approved petition for alien relative (Form I-130) would have yielded in a non-abusive relationship."  4 Immigration Law and Procedure § 41.05 (2019).  "The ultimate result of both petitions is the same; i.e., classification as an immediate relative who is immediately eligible to adjust her status."  *Id.*; *see also* 8 C.F.R. § 204.1(a)(3).

32. As a result, the VAWA self-petitioner may also apply for adjustment of status, under the same framework set out above for typical spouse beneficiaries.  *See* 8 C.F.R. §

204.2(c)(3)(i).

33. An applicant may qualify as a VAWA self-petitioner, even after the dissolution of the marriage to the abusive U.S. citizen, if the applicant "demonstrates a connection between the legal termination of the marriage within the past 2 years and battering or extreme cruelty by the United States citizen spouse." 8 U.S.C. § 1154(a)(1)(A)(iii)(II) (aa)(CC)(ccc).  Further, if the abused spouse files the I-360 petition and subsequently divorces the abuser, the "divorce . . . after filing of the petition shall not adversely affect the approval of the petition."  *Id.* at § 1154(a)(1)(A)(iv); *see also                                  id.                                  at* § 1154(a)(1)(B)(v)(I); 8 CFR 204.2(c)(1)(ii).

## FACTUAL ALLEGATIONS

### Plaintiff's Ordeal

34. Ms. Abbas came to the United States in 2013 as a student with an F-1 visa and enrolled as an undergraduate at City College.

35. In October 2014, Ms. Abbas married a U.S. citizen, Haroon Moghul.

36. In December 2014, Ms. Abbas and Mr. Moghul concurrently filed an I-130 Petition for Alien Relative and an I-485 Application to Register Permanent Residence.

37. On or around May 21, 2015, Ms. Abbas and Mr. Moghul attended an interview at the USCIS New York Field Office at 26 Federal Plaza, New York, NY 10278.  The USCIS officer conducting the interview informed the couple that the pending application and petition had been approved.

38. However, years have gone by without an adjudication on either the I-130 Petition or the I-485 Application by USCIS.

Case 1:20-cv-00622-VEC   Document 1   Filed 01/23/20   Page 8 of 24

39. Between 2015 and 2016, Ms. Abbas and her spouse made numerous inquiries with USCIS concerning the delay in the application.

40. In early July 2015, Ms. Abbas contacted her local U.S. Congressman, Daniel M. Donovan, Jr. regarding the application.

41. On July 9, 2015, USCIS informed Congressman Donovan's office that "unresolved issues in [Ms. Abbas's case] require thorough review before a decision can be rendered."

42. On July 24, 2015, Ms. Abbas and Mr. Moghul attended an InfoPass Appointment with USCIS to request information about the status of their application and were told that, despite the assurances they received at the initial interview, a "stop" had been placed on the applications, and they were likely to be scheduled for an additional interview. Prior to 2019, individuals could request an InfoPass appointment at USCIS field offices to inquire about the status of a case and meet in person with an immigration services officer.

43. Ms. Abbas and Mr. Moghul updated Congressman Donovan's office as to this development. On July 28, 2015, Ms. Abbas received a letter from Congressman Donovan stating that his office had contacted USCIS and was waiting to get an answer from them.[1]

44. On October 7, 2015, Congressman Donovan's office informed Ms. Abbas that, according to USCIS, her case was still "pending the Security Background Checks."

45. On October 15, 2015, Ms. Abbas and Mr. Moghul appeared for another InfoPass appointment, during which USCIS informed Ms. Abbas that an additional interview would be required.

46. On October 27, 2015, Ms. Abbas and Mr. Moghul sent a request to U.S. Senator Kirsten Gillibrand's office for assistance with their immigration case.

47. On January 17, 2016, Senator Gillibrand's office responded to Ms. Abbas and Mr.

---

[1] 2019 USCIS Freedom of Information Act (FOIA) Response for Juwairia Abbas, p. 728.

Moghul, informing them that, according to USCIS, their case was "still pending extensive background checks."

48. On February 4, 2016, an attorney for the couple sent a letter to USCIS inquiring into why the case was delayed and requesting a prompt adjudication.

49. On March 17, 2016, USCIS issued a message to Ms. Abbas and Mr. Moghul stating that their case was still under review.

50. In or around November 2017, USCIS issued a Stokes interview notice to the couple. Stokes interviews are used when USCIS has additional questions regarding the authenticity of a married couple's relationship.  *See Stokes v. INS*, No. 74 Civ. 1022 (S.D.N.Y. Nov. 10, 1976); *see also* USCIS Adjudicator's Field Manual, Ch. 15.5 New York City District Office ("Stokes") Interview, https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-2449/0-0-0-2716.html.

51. In response, an attorney for the couple wrote to request rescheduling of the interview. USCIS acknowledged receipt of this request but did not reschedule the interview, or otherwise issue any communication concerning the I-130 or I-485 after the scheduled date for the interview had passed.

52. Sadly, during the time that Ms. Abbas was awaiting a determination on her applications, Ms. Abbas also was enduring severe emotional abuse by her spouse.

53. During their marriage, Mr. Moghul dominated, manipulated, and controlled Ms. Abbas through a cyclical pattern of verbal abuse and intimidation, guilt, infidelity, threats of violence, social isolation, financial threats, and public and private humiliation.

54. On many occasions over the course of her marriage, Ms. Abbas's spouse threatened to

have her deported unless she complied with his orders.  He often referred to the United States as "my country," and used Ms. Abbas's uncertain status—and his role in her applications—as a means of manipulating and controlling her.

55. In 2017, the couple separated.

56.  In January 2018, Ms. Abbas filed an I-360 Petition, seeking an immigrant visa under the Violence Against Women Act.  In her filing, she asked to substitute the I-360 Petition for the pending I-130 Petition and hold the I-485 Application in abeyance until such substitution occurred.  USCIS acknowledged receipt of the VAWA self-petition, and notified her that the receipt date was January 30, 2018.

57. If Ms. Abbas's I-130 Petition and I-485 Application had been adjudicated promptly, she would not have been forced into the position of having to file a VAWA I-360 self-petition.

58. In the I-360 Petition, Ms. Abbas included numerous affidavits and letters from mental health professionals, spiritual advisors, and personal and professional contacts who treated her or were aware of the spousal abuse.  The materials detailed the effects of Mr. Moghul's abuse on Ms. Abbas and particular episodes of abuse that the individuals witnessed.

59. On March 29, 2018, USCIS sent Ms. Abbas a notice stating that her application had been reviewed and found to establish a prima facie case for classification under VAWA's self-petitioning provisions.

60. After Ms. Abbas filed the VAWA petition, she continued to press for adjudication.  In 2017 and subsequently, Ms. Abbas filed FOIA requests in an attempt to ascertain why the adjudications have been so delayed.  She has also obtained new counsel, who have

contacted the government regarding Ms. Abbas's case to no avail.

61. On January 19, 2020, Ms. Abbas filed a case inquiry with USCIS concerning her I-360 Petition.  Applicants can file a case inquiry with USCIS concerning the status of a petition or application that is outside of normal processing time.

62. As of the date of filing, Ms. Abbas's I-360 Petition is outside of normal processing time for similar petitions processed at the Vermont Service Center.  *Check Case Processing Times*, U.S. Citizenship and Immigration Services, https://egov.uscis.gov/processing-times/ (last visited Jan. 23, 2020).

63. Ms. Abbas still has not received a determination on her I-360 Petition or I-485 Application.

64. It has now been over five years since Ms. Abbas initially filed the I-130 Petition and I-485 Application, and two years since Ms. Abbas filed the I-360 VAWA self-petition.  In total, Ms. Abbas has waited half a decade for a determination as to whether she will be granted permanent residency.

**Stagnation in the Controlled Application Review & Resolution Program (CARRP)**

65. On March 5, 2018 USCIS provided Ms. Abbas with a copy of her A-file in response to a Freedom of Information Act/Privacy Act Request.

66. Numerous references in the file indicate that USCIS has subjected Ms. Abbas's application to a protracted review in the Controlled Application Review & Resolution Program (CARRP).

67. CARRP is an agency-wide scheme for singling out, processing, and adjudicating immigration applications that fit an overbroad and improperly discriminatory profile.

68. CARRP review results in extraordinary processing and adjudication delays, often lasting

many years, and unwarranted denials of applications by statutorily eligible immigrants who are entitled to immigration benefits.

69. As applied, the program disproportionately and unlawfully discriminates against applicants from Muslim-majority countries, like Ms. Abbas.

70. The fact Ms. Abbas's petition has been subjected to CARRP review is clear from her file.

71. A January 23, 2017 routing sheet indicates that her file was sent by "ISA Rosenberger – CARRP Unit" to another office.[2]

72. In addition, a July 29, 2015 routing slip indicated that her file was sent to "FDNS," the "Fraud Detection and National Security Directorate."[3]  This provides further indication that Ms. Abbas's application was subject to CARRP review because, according to USCIS policy documents, "FDNS-IO is responsible for conducting the internal vetting of a CARRP case."[4]

73. In addition, text on a May 6, 2015 referral sheet states: "Petitioner, a citizen of the United States, has TECS Hit that related to B10."  A handwritten note on the page further states that a relative "is a B10."[5]   TECS is an information sharing platform maintained by DHS, which is used in the CARRP review process.[6]  Further, CARRP directs officers to

---

[2] 2018 USCIS FOIA Response for Juwairia Abbas, p. 350.

[3] *Id.* at 375.

[4] USCIS CARRP Memoranda, Jonathan R. Scharfen, Deputy Director, Policy for Vetting and Adjudication Cases with National Security Concerns (April 11, 2008), 4, https://www.uscis.gov/sites/default/files/USCIS/About%20Us/Electronic%20Reading%20Room/Policies_and_Manuals/CARRP_Guidance.pdf.

[5] 2018 USCIS FOIA Response, p. 663.

[6] DHS, TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative (Aug. 5, 2011) https://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-cbp-tecs-sar-update.pdf.

look for "B10" responses as part of their review.[7]

74. Similarly, a handwritten note on an undated I-485 Application adjudication processing worksheet states "need to refer to FDNS.  Peti [sic] has TECS hit that relate to B10."[8]

75. USCIS created CARRP in April of 2008.  Importantly, Congress did not enact CARRP, and USCIS did not promulgate it as a proposed rule in keeping with the notice-and-comment procedures mandated by the APA.  *See* 5 U.S.C. § 553(b)–(c).  For years, USCIS made no information about CARRP available to the public, except in response to Freedom of Information Act requests and litigation to compel responses to those requests.[9]

76. CARRP directs USCIS officers to screen immigration applications—including applications for adjustment of status—for supposed "national security concerns."

77. If a USCIS officer determines that an application presents a supposed concern, the defendant agency takes the application off of a "routine adjudication" track and—without notifying the applicant—places it on a CARRP adjudication track where it is subject to procedures and criteria unique to CARRP.   Except in extremely limited circumstances, this results in lengthy delays and impedes approval, irrespective of an applicant's eligibility and entitlement to the immigration benefit under the law.

78. The CARRP scheme tars applicants as "national security concerns" based on vague and

---

[7]    ACLU of Southern California, *Muslims Need Not Apply*, April 2013, 65 n. 11, https://www.aclusocal.org/sites/default/files/carrp-muslims-need-not-apply-aclu-socal-report.pdf
[8]  2018 USCIS FOIA Response for Juwairia Abbas, p. 685-686.

[9] The facts relating to the implementation of CARRP alleged in this Complaint are drawn from Defendant USCIS's own records, which were obtained by the American Civil Liberties Union through FOIA litigation.  Some of these records were later published by USCIS.   All documents are available online at either https://www.aclusocal.org/en/CARRP                                                                                                or https://www.uscis.gov/sites/default/files/USCIS/About%20Us/Electronic%20Reading%20Room/Policies_and_Manuals/CARRP_Guidance.pdf .

overbroad criteria that often use travel patterns as thin proxies for religion and national origin, lawful activity, and innocuous associations—resulting in Muslims being disproportionately targeted.

79. CARRP criteria are untethered from the statutory criteria that determine whether or not a person is eligible for the immigration status they seek and are so general that they necessarily and unjustly ensnare individuals who pose absolutely no threat to the security of the United States.

80. Agency records relating to CARRP are redacted in significant part. What is publicly accessible, however, reveals that almost all of the over 19,000 individuals targeted under CARRP between 2008 and 2012 originated from Muslim-majority countries.[10]

81. CARRP divides people supposedly presenting national security concerns into two groups. One is the category of "Known or Suspected Terrorists" (KSTs). The other category is "non-Known or Suspected Terrorists" (non-KSTs).  Both categories are extremely broad and therefore prone to include people who present no threat whatsoever.

82. A person is designated a KST for CARRP purposes if their name appears in the Terrorist Screening Database (TSDB), often referred to as the Terrorist Watchlist—a database that is itself rife with outdated information and classifications unsupported by factual or reliable evidence.[11]

83. The government's Watchlisting Guidance sets a very low "reasonable suspicion"

---

[10] According to USCIS data, individuals tracked for CARRP adjudication between fiscal years 2008-2012 were born in or were citizens of the following countries: Afghanistan, Egypt, Indonesia, Iran, Iraq, Jordan, Kuwait, Lebanon, Libya, Morocco, Pakistan, Saudi Arabia, Somalia, Sri Lanka, Sudan, Syria, Tunisia, Uzbekistan, Yemen-Aden, and Yemen-Sanaa. With the exception of Sri Lanka, all of those are Muslim-majority countries. U.S. Citizenship & Immigration Services, Table A9.2, Persons with NS Concerns by Country and NS Concern Type: Fiscal Years 2005-2012,    https://www.aclusocal.org/sites/default/files/wp-content/uploads/2014/07/Persons-with-NS-Concerns-by-Country-and-NS-Concerns-by-Type-for-FY-2005-2012.pdf.

[11] National Counterterrorism Center, Watchlisting Guidance (March 2013), https://theintercept.com/document/2014/07/23/march-2013-watchlisting-guidance/.

standard for a "nomination" to be placed on the TSDB.  The "reasonable suspicion" standard does not require the nominator to assess that it is more probable than not that the nominated individual meets the criteria.  This means that individuals can be placed on the TSDB even if nominators simply think the individuals might, but probably do not, meet the criteria.

84. Under the Guidance, concrete facts are not necessary to satisfy the reasonable suspicion standard.  Uncorroborated information of questionable or even doubtful reliability can serve as the basis for watchlisting.

85. Further, the Guidance permits watchlisting of non-citizens simply for being associated with an individual who is already on a watchlist, even if there no indication of involvement with that person's purported suspicious activity.

86. These very loose standards greatly increase the risk that the TSDB contains information on individuals who are neither known nor suspected terrorists.

87. Even where USCIS is unable to label an applicant a KST, they are not taken off the CARRP adjudication track.  Rather, officers are instructed to look for "indicators" of a non-KST concern, including (1) non-statutory indicators, (2) statutory indicators, and (3) indicators in security check results.

88. The search for indicators is not limited to the applicant.  Rather, "in all cases," USCIS also considers "indicators related to family members or close associates of the individual to determine whether those indicators relate to the individual as well."[12]

89. In particular, the "non-statutory indicators" are consistent with a pattern of

---

[12] USCIS CARRP Memoranda, Jonathan R. Scharfen, Deputy Director, Policy for Vetting and Adjudication Cases with National Security Concerns (April 11, 2008), 4, https://www.uscis.gov/sites/default/files/USCIS/About%20Us/Electronic%20Reading%20Room/Policies_and_Manuals/CARRP_Guidance.pdf.

disproportionate discrimination against applicants from Muslim-majority countries. They include "travel through or residence in areas of known terrorist activity," a label that, in the contemporary geopolitical context, functions as a thinly veiled code for Muslim-majority countries such as Pakistan.

90. The "non-statutory indicators" also include "large scale transfer or receipt of funds"; a person's employment, training, or government affiliations; the identities of a person's family members or associates, such as a "roommate, co-worker, employee, owner, partner, affiliate, or friend"; or simply "other suspicious activities."

91. Once a USCIS officer singles out an application for adjudication under the CARRP scheme, the application is subjected to CARRP's separate set of rules and procedures that guide officers to deny such application or, if an officer cannot find any basis to deny the application, to delay adjudication as long as possible.

92. CARRP records instruct officers to first conduct the standard eligibility screening conducted in all immigration adjudications.  However, while a non-CARRP applicant would be granted adjustment upon being found eligible at this stage, applicants targeted under CARRP are subjected to further scrutiny, even where the standard vetting process reveals no grounds for denial.

93. In the first stage of CARRP, USCIS officers conduct "internal vetting" to look for any possible reason to deny an application so that "valuable time and resources are not unnecessarily expended" to investigate the possible concern.

94. Where no legitimate reason supports denial of an application adjudicated through CARRP, the program encourages USCIS officers to find a pretextual basis to deny the application.

95. Where USCIS cannot find even a pretextual basis to deny an application under this "internal vetting" stage of CARRP adjudication, the case proceeds to "external vetting." At this stage, USCIS requests information from outside agencies that might provide justification to deny the application or initiate removal proceedings.

96. Throughout, CARRP also requires "deconfliction," a process in which other agencies are notified of the application and given the opportunity to request an adjudication hold at any time. During "deconfliction," outside agencies are also empowered to advise USCIS whether or not the application should be approved based on those external agencies' own independent preferences, which can be entirely unrelated to the statutory criteria for naturalization.

97. Even where internal vetting, external vetting, and deconfliction have all failed to identify a reason to deny the application and the applicant is otherwise statutorily eligible to naturalize, CARRP still prohibits USCIS officers from approving the application. Field officers customarily authorized to adjudicate applications are not permitted to approve so-called "non-KST" applications unless they obtain approval and concurrence from a "senior level official." And applications on the KST track are explicitly barred from approval by officers in the field and must be routed to USCIS headquarters.

98. Because Ms. Abbas's applications have been subjected to CARRP, this scheme has contributed to the severe and unwarranted delay in adjudicating her status.

**Effect of Delay on Ms. Abbas**

99. The years of delay in processing Ms. Abbas's applications has caused tremendous disruption to her life. If her application had been approved shortly after her initial interview in 2015—as the USCIS officer present at the interview indicated would

happen—she would now be eligible to naturalize as a U.S. citizen.  Instead, she has spent years in limbo, anxiously awaiting a determination on her LPR status.

100. The uncertainty in her status has resulted in a cascade of complications, which have impeded her ability to find work, secure a residence, pursue an education, receive medical treatment, and maintain basic relationships with her family.

101. Given the pendency of her applications, Ms. Abbas must seek work authorization while she continues to live in the United States.  These efforts too have been met with extreme delay.

102. In March 2018, Ms. Abbas, applied to renew her work authorization, submitting a Form I-765.  According to USCIS, this application was approved, but Ms. Abbas never received the work authorization card.

103. Ms. Abbas made two service requests for the work authorization, to no avail.

104. After waiting months, Ms. Abbas filed another work authorization application in November 2018.  By that point, her work authorization card had been expired for eight months.

105. On July 2, 2019, USCIS took its first action with respect to the November 2018 application, by transferring it to the Vermont Service Center. This was more than eight months after Ms. Abbas filed the second application, and occurred in response to prompting by undersigned counsel.

106. Ms. Abbas ultimately received her renewed work authorization card in October 2019.

107. All told, Ms. Abbas went over a year and a half without work authorization documentation—even though a 2018 inquiry to USCIS confirmed that a work authorization card was issued with validity through July 16, 2019.

108. Had Ms. Abbas's applications for LPR status been adjudicated in a timely fashion, she would not have needed to obtain a work authorization to earn money for herself, much less wait a year and a half for processing of her work authorization renewal.  Even now, Ms. Abbas may be subjected to the same delays and uncertainty any time she must seek renewal of her work authorization.

109. As a result of these difficulties in obtaining her work authorization documentation, it has been extremely difficult for Ms. Abbas to find steady work to make ends meet.  Ms. Abbas pursued many applications and interviews.   However, her inability to provide documentation of her work authorization proved a consistent impediment to employment.

110. The lack of stable employment has caused Ms. Abbas extreme financial strain.

111. In particular, Ms. Abbas is currently unable to afford a long-term residence of her own. She has put most of her belongings in storage, and has been living with a close friend since October 2019.

112. Given her financial limitations, Ms. Abbas is frequently unable to afford subway fare. She instead resorts to walking long distances to make her appointments.

113. The delay in processing her applications has also severely undermined Ms. Abbas's efforts to pursue an education.

114. Ms. Abbas has been studying intermittently since she arrived in the U.S. as an undergraduate at City College.

115. When Ms. Abbas was an undergraduate, she planned to attend medical school. However, the delays in processing her immigration petition derailed her plans, as she needed to receive permanent resident status in order to apply to medical school in the United States.

116. Ultimately, Ms. Abbas decided to pursue an LLM at Fordham School of Law.  She
recently completed her LLM coursework in December 2019, and will take the bar exam
in February 2020.

117. Ms. Abbas qualified to receive financial aid from Fordham.  However, Fordham needed
to receive verification from Defendant DHS of Ms. Abbas's status every six months,
before distributing the aid.  DHS approved and verified her status to Fordham for the
January-May 2019 period.  However, when the time came for Ms. Abbas to reapply and
renew the verification for the fall 2019 semester, DHS did not verify Ms. Abbas's status
to Fordham for 45 days.  During this time, Fordham could not release her financial aid,
leaving Ms. Abbas without crucial assistance.  At that point, Ms. Abbas was still awaiting
her work authorization, making it extremely difficult to support herself financially.

118. In addition, while studying at Fordham, Ms. Abbas was selected to participate in a
program to travel to the Immigration and Customs Enforcement detention facility in
Dilley, TX, as a student advocate.  Ultimately, however, the director of the program
strongly advised her not to attend, because there was a significant risk that she would be
detained by immigration authorities due to the fact that, at the time, she did not have her
work authorization card.  As a result, Ms. Abbas was forced to forego a significant
professional development opportunity.

119. The uncertainty in her immigration status has also severely interfered with her ability to
receive medical treatment.

120. During the time that she was included on Mr. Moghul's health insurance, she was thrice
dropped from his insurance due to complications arising from her immigration status.

121. Beyond this, perhaps the most difficult complication of Ms. Abbas's uncertain status

has been its impact on her ability to see her family with any regularity.  At times, she has gone years at a time without seeing her parents, sister, and grandparents.

122. During the pendency of her applications, Ms. Abbas's grandfather became ill.  In light of her status, Ms. Abbas was unable to leave the country without advance parole.  In February 2016, she applied for advance parole to visit her ill grandfather, yet she was not granted authorization to leave the country in time.  Her grandfather passed away before Ms. Abbas was able to see him.

123. All told, the uncertainty resulting from the delay in Ms. Abbas's applications has permeated every aspect of her life, and has severely strained or rendered unobtainable many basic necessities, such as work, housing, healthcare, and family relationships.

## CAUSES OF ACTION

### COUNT ONE

### Administrative Procedure Act
### 5 U.S.C. §§ 555(b) and 706(1)

124. The allegations in the paragraphs above are repeated and incorporated as if fully set forth herein.

125. The APA compels USCIS to "conclude a matter presented to it" "with due regard for the convenience and necessity of the parties" and "within a reasonable time." 5 U.S.C. § 555(b). The Court has authority under 5 U.S.C. § 555 to order an agency to "conclude a matter presented to it."

126. Defendants' failure to adjudicate Ms. Abbas's I-360 Petition and I-485 Application within a reasonable timeframe violates the Administrative Procedure Act (APA) because the agency's inaction constitutes a failure to "conclude a matter presented to it." 5 U.S.C.

§ 555(b).

127. This Court also has power under 5 U.S.C. § 706(1) to compel an agency to perform "action unlawfully withheld or unreasonably delayed."

128. Defendants' failure to adjudicate Ms. Abbas's I-360 Petition and I-485 Application within a reasonable timeframe also violates the APA as the alleged agency action is "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

129. Defendants have a duty to adjudicate the applications.   8 C.F.R. §§ 245.2(a)(5), 204.2(a)(3).

130. To date, it has been over five years since Ms. Abbas initially filed the I-130 Petition and I-485 Application, and two years since Ms. Abbas filed the I-360 VAWA petition.

131. This inexplicable delay violates Defendants' duties and Ms. Abbas's rights under the APA.

## COUNT TWO

### Mandamus Act
### 28 U.S.C. §§ 1361 and 1651

132. The allegations in the paragraphs above are repeated and incorporated as if fully set forth herein.

133. Issuance of a writ of mandamus requires a showing that "(1) there is a clear right to the relief sought; (2) the Government has a plainly defined and peremptory duty to perform the act in question; and (3) there is no other adequate remedy available." *Benzman v. Whitman*, 523 F.3d 119, 1332-33 (2d Cir. 2008).   Ms. Abbas's situation satisfies all of these criteria.   *See Escaler v. USCIS*, 582 F.3d 288, 293 (2d Cir. 2009) (noting circumstances where mandamus could be available to appellant with "no clear avenue" of

administrative review).

134. Defendants have a clear duty to act on Ms. Abbas's applications and have unreasonably failed to render a decision for more than five years after Ms. Abbas filed an 1-130 Petition and I-485 Application, and two years after Ms. Abbas filed an I-360 Petition, thereby depriving her of the right to have the immigrant visa petition and adjustment of status application adjudicated. 8 C.F.R. §§ 245.2(a)(5), 204.2(a)(3).

135. Ms. Abbas has complied with all statutory and regulatory requirements in connection with the I-360 Petition and I-485 Application.

136. Adjudication of Plaintiff's I-360 Petition and I-485 Application is a nondiscretionary duty that the Defendants are obligated to perform in a timely manner. Ms. Abbas has no alternative means to obtain adjudication of her applications, and has a clear right to issuance of the writ.

## COUNT THREE

### Equal Access to Justice Act
### 28 U.S.C. § 2412

137. The allegations in the paragraphs above are repeated and incorporated as if fully set forth herein.

138. If Plaintiff prevails, she will seek fees and costs under the Equal Access to Justice Act (EAJA), as amended, 28 U.S.C. § 2412.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A. Order that jurisdiction is proper and assume jurisdiction over the matter;

B. Issue a writ of mandamus or other order compelling the Defendants and those acting under them to perform their duty to issue a decision on Ms. Abbas's I-360 Petition and I-485 Application without further delay;

C. Award reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D. Grant such other and further relief as this Court deems just and proper.

Date: January 23, 2020

Respectfully submitted,


  /s/Joshua Kipnees
Joshua Kipnees
Abigail Marion
**PATTERSON BELKNAP**
   **WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
jkipnees@pbwt.com
amarion@pbwt.com

Naz Ahmad
*Staff Attorney*
Ramzi Kassem
*Director*
**CLEAR PROJECT**
**MAIN STREET LEGAL SERVICES, INC.**
CUNY SCHOOL OF LAW
2 COURT SQUARE
LONG ISLAND CITY, NY 11101
(718) 340-4630 / 4558
naz.ahmad@law.cuny.edu
ramzi.kassem@law.cuny.edu
*Attorneys for Plaintiff*